1
2
3
4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   LAUREN BAUMGARTNER,                    Case No.16-cv-05384-HRL

          Plaintiff,
8
                                           **ORDER RE: CROSS-MOTIONS FOR**
9       v.                                 **SUMMARY JUDGMENT**

10  NANCY A. BERRYHILL,                     Dkt. Nos. 27, 33

11        Defendant.

12

13        Plaintiff Lauren Baumgartner ("Baumgartner") appeals a final decision of the

14  Commissioner of the Social Security Administration (the "Commissioner") denying

15  Baumgartner's application for disability benefits under Titles II and XVI of the Social Security

16  Act. The parties filed cross-motions for summary judgment. Dkt. Nos. 27, 33. All parties

17  consented to magistrate judge jurisdiction. Dkt. Nos. 15, 17.

18        For the reasons described below, the Court denies Baumgartner's motion for summary

19  judgment and grants the Commissioner's cross-motion for summary judgment.

20  **I.     FACTUAL BACKGROUND**

21        Baumgartner was born in 1980 in Maryland. AR 1537. She attended Bryn Mawr College,

22  but dropped out around her junior year following a dispute with a professor. AR 64-65. She

23  worked for about a year as an assistant librarian in Bryn Mawr, and then was a

24  receptionist/medical assistant at a Planned Parenthood clinic in Philadelphia. AR 66-67. Most

25  recently, she was a leasing consultant for a residential apartment management company.

26  Baumgartner resigned after her manager complained that she was missing too much work due to

27  medical issues. AR 65-66. She has not had a full-time job since 2006.

28        Baumgartner's life has been punctuated by trauma. Her parents, especially her father, were

1    physically and emotionally abusive.  AR 1537, 1594.  As a teenager, Baumgartner was anorexic.

2    AR 1112.  At sixteen, she was raped.  AR 802.  She later married and gave birth to a daughter, but

3    her husband was abusive to the point that Baumgartner obtained restraining orders against him.

4    AR 1284.  A subsequent boyfriend sexually molested her daughter.  AR 1537.  Baumgartner and

5    her daughter, who is dyslexic, have been homeless for extended periods.  *Id.*

6           When she was fifteen, Baumgartner fell off of a horse, injuring her lower back.  AR 580.

7    Ever since, she has complained of lower back pain that extends down to her legs.  *Id.*  An MRI in

8    2011 revealed mild degenerative disc disease at the L4-L5 vertebrae (the fourth and fifth vertebrae

9    of the lumbar spine) and the L5-S1 vertebrae (the fifth vertebra of the lumbar spine and the first of

10   the sacrum).  AR 1078.[1]  A doctor summarized the MRI as showing "some mild arthritis but

11   otherwise normal."  AR 1076.  By May 2015, an x-ray showed "marked narrowing of the L5-S1

12   disc space."  AR 1539.

13          Baumgartner has also experienced chronic pain in her pelvic region since around 2003,

14   when she had an IUD inserted and then removed a few months later.  Ever since the IUD was

15   removed, she has experienced severe pain, especially during menstruation.  Baumgartner testified

16   that she's essentially non-functional during her periods, which she said are irregular and

17   unpredictable.  AR 71.  "I'll be in bed normally for at least about five days.  I'll be in bed all day

18   and all night."  *Id.*  Baumgartner's daughter cares for Baumgartner – and for herself – while

19   Baumgartner is incapacitated by pelvic pain.  AR 71-73.  Baumgartner homeschools her daughter

20   because the pelvic pain is so debilitating that Baumgartner did not believe she could ensure her

21   daughter's consistent attendance at a public school.

22          In 2013, a consultative examiner, Dr. Farah M. Rana, noted that Baumgartner exhibited

23   "[m]ild lower back tenderness," but that her "range of motion [was] within normal limits."  Dr.

24   Rana's impression was that Baumgartner's chronic lower back pain was "most probably secondary

25   to degenerative disc/degenerative joint disease," and added that her "[c]hronic pelic pain is of

26   questionable etiology."  AR 132.

27

28   _____
     [1] The ALJ's written decision incorrectly cites to AR 609.

2

1    The medical record suggests that Baumgartner's doctors have generally advocated a

2    conservative approach to treating her pain symptoms, and that Baumgartner has declined more

3    aggressive treatments.  In 2009, a doctor recommended hormone-induced amenorrhea (the

4    absence of menstruation), but Baumgartner declined.  AR 657.  According to Baumgartner, she

5    tried hormonal suppression of her menstrual cycles before and it only made the problem worse.

6    AR 1527.  As of October 2010, when Baumgartner was complaining of increasingly debilitating

7    pelvic and lower back pain, she was taking only zolpidem (commonly known as Ambien) to help

8    her sleep, and 800 milligrams of ibuprofen.  Baumgartner's pain management specialist

9    recommended that she take naproxen (commonly known as Aleve), desipramine (an anti-

10   depressant), and an anti-seizure medication.  AR 1133-34.  The pain management specialist also

11   recommended that Baumgartner continue physical therapy, which seemed to provide significant

12   pain relief, but child care responsibilities made it difficult for Baumgartner to attend the therapy

13   sessions.  In 2014, Baumgartner's treating physician, Dr. Andrea Aslan, also recommended

14   hormone-induced amenorrhea, but Baumgartner declined again, preferring to treat her pain

15   through physical therapy.  AR 1457.   In 2015, after Baumgartner was diagnosed with

16   fibromyalgia, Dr. Aslan opined that weakness in Baumgartner's pelvic floor muscles was "likely a

17   big part" of Baumgartner's pain, especially because physical therapy had previously provided pain

18   relief.  AR 1530.  Dr. Aslan asked Buamgartner to consider undergoing a laparoscopy, a surgical

19   procedure used to diagnose abdominal issues, but Baumgartner declined.  AR, 1530, 1636.

20   In addition, Baumgartner is overweight.  She is about five feet, three inches tall, and

21   between 2009 and 2013, her weight fluctuated between 142 pounds and nearly 200.  AR 46-47.

22   Finally, Baumgartner has a history of mental health problems, including depression,

23   anxiety, and a personality disorder.

24   When asked to assign Baumgartner a global assessment of functioning (GAF) score,

25   mental health professionals have reached divergent conclusions.  Some providers assigned

26   Baumgartner GAF scores as low as 65 (indicating moderate symptoms, such as difficulty in social

27   situations and occasional panic attacks).  Others gave her scores as high as 100 (indicating no

28   symptoms at all).  AR 24.  There is more consensus, however, as to how Baumgartner's demeanor

3

1    speaks to her mental health.  Baumgartner has been noted to show signs of depression and anxiety,

2    and she admitted to fleeting suicidal ideation, AR 1632, but she has consistently presented a

3    cooperative, well-appearing, and mostly normal affect.  *See, e.g.*, AR 1623.

4         In June 2010, Dr. Vanessa Wallace-Suhama opined that Baumgartner "presents a text book

5    case of chronic pain syndrome compounded by psychological factors."  AR 583.  Dr. Wallace-

6    Suhama observed that Baumgartner's "main complaint of 'pelvic pain' [ ] appears to have been

7    well addressed" by physical therapy and analgesics.  AR 580.  She added that "[a]s much as pain

8    is an important issue for this patient, the overwhelming need at this time is to help stabilize her

9    psychologically."  AR 583.  About a year later, another doctor echoed Dr. Wallace-Suhama's

10   observation about the psychological component of Baumgartner's pain symptoms, stating that

11   "[t]here appears to be a strong emotional and cognitive behavioral component perpetuating her

12   chronic pain."  The doctor recommended "conservative care," consisting primarily of physical

13   exercise.  AR 1223.

14        Patricia Spivey, Psy.D., a consultative examiner, prepared a mental status disability report

15   on Baumgartner in May 2013.  Spivey diagnosed Baumgartner with an anxiety disorder, and

16   stated that she would experience mild limitations in her ability to withstand the stress of a routine

17   work day, and moderate impairment in her ability to maintain emotional stability and interact

18   appropriately with others.  AR 1330-31.  Spivey opined that "[b]y presentation she is not so severe

19   that she could not work.  She may have some mood problems or interpersonal problems with peers

20   or supervisors."  *Id.*

21        In May 2015, during a psychological evaluation, Baumgartner described her mood as

22   "really stressed" due to the disability benefits application process.  AR 1536.  Baumgartner

23   reported "her overall health as 'very good' apart from chronic pain."  *Id.*  The evaluator reported:

24            "She is independent with all daily activities.. She eats regular meals
             and maintains a daily exercise regimen.  During the day, she goes to
25           the gym, home schools her daughter, shops and cooks, drives herself
             and her daughter to appointments, and sends emails or makes phone
26           calls ("I'm pretty busy").  She described good social support from
             other 'disabled and homeless' friends[.]"
27

28   *Id.*

4

1          Dr. Aquino-Caro, a state medical consultant, initially concluded that Baumgartner's mental

2     impairments did not appear to create severe limitations.  "She reported a great deal of abuse," but

3     her "affect [was] full and congruent" and "[m]emory was fine as was concentration."  AR 108.

4     On reconsideration, Dr. Davis, another state medical consultant, endorsed Dr. Aquino-Caro's

5     earlier conclusion.  Dr. Davis pointed to Dr. Spivey's assessment that Baumgartner's mental

6     health was mostly within normal limits.  AR 139-40.

7     **II.      PROCEDURAL BACKGROUND**

8          Baumgartner applied for disability benefits under Title II in November 2012, AR 362-370,

9     and for Title XVI benefits in December 2012, AR 371-75.  The Commissioner denied

10    Baumgartner's claims initially, AR 164-73, and upon reconsideration, AR 169-73, and

11    Baumgartner requested a hearing before an administrative law judge, AR 192-93.  After multiple

12    postponements, ALJ Brenton L. Rogozen (the "ALJ") presided over a hearing in September 2015.

13         At the hearing, three witnesses testified, including Baumgartner.  The first, Dr. Irvin S.

14    Belzer, discussed his review of the medical records.  He testified that none of Baumgartner's

15    conditions met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR

16    52.  He also discussed how psychological factors might affect Baumgartner's experience of pain.

17    Dr. Belzer testified that he had not reviewed Baumgartner's mental health records carefully, but he

18    agreed that the diagnosis of "chronic pain compounded by psychological factors" might affect

19    Baumgartner's experience of pain.  He also said that it would be possible for someone with

20    chronic pelvic pain symptoms to become "essentially non-functional."  AR 62-63.  Finally, when

21    the ALJ asked, "So do you think that her [residual functional capacity] if we were to take into

22    consideration her pain to the extent that you find it credible . . . do you think that pain would

23    further limit the RFCs?" Belzer answered yes.  "It could.  To me it would go toward that she might

24    have to miss work more – she might have to miss work because of pain."  AR 63.

25         Darlene McQuary, a vocational expert, also testified.  McQuary matched Baumgartner's

26    prior jobs with the corresponding entries in the Dictionary of Occupational Titles.  According to

27    McQuary, all of Baumgartner's prior relevant work required only a minimal amount of physical

28    strength.  AR 79-81.

1    The ALJ issued a written decision in May 2016.  AR 21.  After concluding that

2   Baumgartner met the insured status requirement for Title II benefits, AR 23, the ALJ considered

3   Baumgartner's claim of disability with the five-step, sequential evaluation approach that is

4   required by the Commissioner's regulations.  *See* 20 C.F.R. § 404.1520.[2]  At step one, the ALJ

5   found that despite some intermittent work activity, Baumgartner had not performed substantial

6   gainful activity since the alleged onset date of her disability (March 2006).  AR 23.  At step two,

7   the ALJ found that Baumgartner had three impairments that qualified as severe: (1) back pain; (2)

8   pelvic pain; and (3) obesity.  *Id.*  The ALJ concluded that Baumgartner's mental impairments were

9   not severe.  AR 23-26.  At step three, the ALJ determined that none of Baumgartner's impairments

10   or combinations thereof met or was medically equal to the listed impairments in 20 C.F.R. Part

11   404, Subpart P, Appendix 1.  AR 26.

12    At step four, the ALJ found that Baumgartner had a residual functional capacity ("RFC")

13   to perform "the full range of light work as defined in" 20 C.F.R. §§ 404.1567(b).  AR 27-35.  The

14   ALJ concluded that, based on her RFC, Baumgartner could perform her past relevant work as a

15   medical assistant and a library assistant.  Having determined that Baumgartner could perform her

16   past relevant work, and that she was therefore not disabled, the ALJ did not proceed to step five of

17   the sequential evaluation.

18    The ALJ accorded substantial weight to the opinions of the state agency medical

19   consultants.  AR 25.  The consultants determined that Baumgartner had "mild low back

20   tenderness," and noted that she was taking "low grade opiates for mild [degenerative disc disease]

21   and other mild abnormalities."  AR 156.  They concluded that she could perform light work with

22   some postural limitations.  *Id.*

23    The ALJ also determined that Baumgartner's allegations as to the severity of her pain

24   symptoms were not entirely consistent with the medical record.  The ALJ argued that "physical

25   examinations have been within normal limits or shown few objective findings, generally limited to

26   tenderness [in] the claimant's pelvic and lumbar musculature[.]"  AR 34.  The ALJ also noted that

27

28   [2] The Title II and Title XVI regulations are often identical.  Accordingly, for the remainder of this
order, and unless otherwise noted, the Court will cite to the Title II regulations.

1    Baumgartner had refused recommended treatment, including hormone-induced amenorrhea, and a

2    laparoscopy.  AR 24.  Finally, the ALJ argued that Baumgartner's activities of daily living,

3    including exercise, homeschooling her daughter, and performing housework, were all inconsistent

4    with the level of alleged impairment.  AR 34.

5         As to her mental impairments, ALJ noted that Baumgartner's "mental status examinations

6    have routinely been within normal limits, except for mood changes," and he emphasized her

7    independence in daily activities, as well as her description of a strong, supportive social network.

8    AR 34-35.  The ALJ concluded (at step two of the sequential analysis), that Baumgartner had no

9    more than mild limitations in her activities of daily living, social functioning, and concentration,

10   persistence and pace.  *See* 20 C.F.R. § 404.1520a (describing broad functional areas by which

11   ALJs must evaluate mental impairments).

12        The Appeals Council denied Baumgartner's request to review the ALJ's decision, and

13   Baumgartner sought judicial review in this Court.  Dkt. No. 1.

14   **III.    LEGAL STANDARD**

15        This Court has jurisdiction to review the Commissioner's decision to deny benefits, but

16   must affirm if the Commissioner's decision applies the correct legal standards and is supported by

17   substantial evidence.  42 U.S.C. § 405(g) ("findings of the Commissioner ... as to any fact, if

18   supported by substantial evidence, shall be conclusive"); *Molina v. Astrue*, 674 F.3d 1104, 1110

19   (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might

20   accept as adequate to support a conclusion," and is "more than a mere scintilla, but may be less

21   than a preponderance."  *Molina*, 674 F.3d. at 1110-11 (citations omitted).  A court must consider

22   the record as a whole when assessing whether the Commissioner's decision is supported by

23   substantial evidence.  *See Howard v. Heckler*, 782 F.2d 1484, 1487 (9th Cir. 1986).  "If the

24   evidence is susceptible to more than one rational interpretation, the court may not substitute its

25   judgment for that of the Commissioner."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir.

26   2001) (citations omitted).

27        "[E]ven when the ALJ commits legal error," however, the reviewing court is to "uphold

28   the decision where that error is harmless."  *See Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th

7

1    Cir. 2015) (internal quotation marks and citation omitted).  An error is harmless only if it is

2    "inconsequential to the ultimate nondisability determination." *Id.* at 494 (citation omitted).

3    **IV.    DISCUSSION**

4           All of Baumgartner's arguments boil down to a claim that the ALJ erred in considering her

5    mental impairments.  She contends, first, that the ALJ incorrectly determined, at step two of the

6    sequential analysis, that she did not have a severe mental impairment.  Baumgartner argues that,

7    had the ALJ considered how psychological factors compound her perception of pain, the ALJ

8    would have concluded that she had a severe mental impairment.  Dkt. No. 27 at 11-13.  Second,

9    Baumgartner asserts that the ALJ's conclusion that Baumgartner experiences only mild

10   impairment in her social functioning was not supported by substantial evidence.  Dkt. No. 27 at

11   14-15.  The remainder of Baumgartner's summary judgment motion further develops the argument

12   that the ALJ's conclusion as to her mental impairment was incorrect.

13          An impairment is severe if it "significantly limits [the claimant's] physical or mental

14   ability to do basic work activities[.]"  20 C.F.R. § 404.1520.  "[A] finding of 'not disabled' is

15   made at this step when medical evidence establishes only a slight abnormality or a combination of

16   slight abnormalities which would have no more than a minimal effect on an individual's ability to

17   work[.]"  SSR 85-28, 1985 WL 56856, at *3.  The step-two inquiry is a "de minimis screening

18   device [used] to dispose of groundless claims."  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir.

19   2005) (citation omitted).  "It is not meant to identify the impairments that should be taken into

20   account when determining the RFC.  In fact, '[i]n assessing RFC, the adjudicator must consider

21   limitations and restrictions imposed by all of an individual's impairments, even those that are not

22   'severe.'"  *Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017) (quoting SSR 96-8p, 1996

23   WL 374184, at *5).

24          Here, the ALJ found that Baumgartner did not have a mental impairment that qualified as

25   severe.  Baumgartner argues that the ALJ failed to consider how psychological and physical

26   factors combined to exacerbate her pain symptoms.  *See Lester v. Chater*, 81 F.3d 821, 829 (9th

27   Cir. 1996) ("A claimant's illnesses must be considered in combination and must not be

28   fragmentized in evaluating their effects.")  She relies, in particular, on the testimony of Dr. Belzer

1    to argue that her pain symptoms are more severe than the ALJ acknowledged.

2    Baumgartner is correct that the ALJ's written decision did not directly address the extent to

3    which psychological factors exacerbated her pain symptoms. The written decision acknowledged

4    that Baumgartner was diagnosed with a pain disorder, and the ALJ noted that she received

5    evaluation for "stress and coping in the context of chronic pain." AR 24. Yet the ALJ's step-two

6    analysis focused primarily on Baumgartner's history of and treatment for depression, anxiety,

7    insomnia, and difficulty in social functioning. AR 24-26.

8    However, the ALJ thoroughly addressed Baumgartner's subjective experience of pain at

9    step four of the sequential analysis. The ALJ did not frame the issue of Baumgartner's pain in

10    terms of psychological factors compounding her symptoms, but he did ask whether Baumgartner's

11    allegations as to the intensity, persistence, and limiting effects of her pain were consistent with the

12    record as a whole. And whereas the step-two analysis is merely a "de minimis screening device,"

13    *Webb*, 433 F.3d at 687, the ALJ considered all of the evidence when determining Baumgartner's

14    RFC at step four. As a result, as long as the ALJ's conclusions at step four were supported by

15    substantial evidence, any error at the step two phase would be harmless. *See Koble v. Berryhill*,

16    No. 16-CV-02792 NC, 2017 WL 2219992, at *6 (N.D. Cal. Apr. 10, 2017) (concluding that any

17    error at step two was harmless where evidence of allegedly severe impairment was properly

18    considered at step four) (citing *Lewis v. Astrue*, F.3d 909, 911 (9th Cir. 2007)).

19    The Commissioner points out that Baumgartner did not specifically challenge the ALJ's

20    credibility findings as to Baumgartner's allegations of pain. Even if Baumgartner were to

21    challenge the ALJ's treatment of her subjective experience of pain, however, the argument would

22    fail. Baumgartner's activities of daily life, the conservative treatment she was prescribed, her

23    refusal of recommended treatments, and the opinions of the state medical consultants, were all

24    valid reasons for the ALJ to discount Baumgartner's allegations.

25    Further, Baumgartner overstates the extent to which Dr. Belzer's testimony supports her

26    case. Dr. Belzer offered a hypothetical assessment of whether he would assign Baumgartner a

27    lower RFC if he found her pain allegations to be credible. AR 62-63. As noted above, substantial

28    evidence supported the ALJ's conclusion that Baumgartner's pain allegations were not entirely

1    consistent with the record as a whole.

2         Second, Baumgartner argues that she had more than mild limitations in social functioning.

3    Baumgartner argues that much of the chaos in her personal life, including the conflict that lead to

4    her dropping out of college, and her failed, abusive relationships, all point to a more serious social

5    impairment.

6         Here, too, the ALJ's conclusion was supported by substantial evidence.  The ALJ cited to

7    Baumgartner's independence in her activities of daily living, and the support she says she receives

8    from friends.  The ALJ also noted that on physical and mental exams, Baumgartner consistently

9    presented a mostly-normal affect.  This evidence is adequate to support the ALJ's conclusion.

10   Moreover, even if the Court were to reject the ALJ's finding on this issue, the error would likely

11   be harmless.  ALJs evaluate the severity of an alleged mental impairment by examining four broad

12   functional areas, only one of which is social functioning.  *See* 20 C.F.R. § 404.1520a.  The ALJ

13   might have determined that Baumgartner had more than mild impairment in social functioning and

14   still concluded that she did not have a mental impairment that qualified as severe.

15        Baumgartner raises various other objections to the ALJ's findings as to her mental

16   impairments.  She argues that the ALJ was wrong to rely on the GAF scores that indicated the

17   least amount of impairment.  Even the GAF tests that are more favorable to Baumgartner's

18   argument, however, suggested only moderate limitations.  Additionally, Baumgartner accuses the

19   state psychological medical consultants, Dr. Aquino-Caro and Dr. Davis, of not providing

20   adequate explanations for their conclusions.  The Court disagrees.  The disability determination

21   reports prepared by both doctors summarize the medical evidence and explain why they both

22   concluded that Baumgartner did not qualify for benefits.

23        Finally, Baumgartner argues that the Commissioner's failure to dispute certain facts

24   requires the Court to enter judgment in her favor.  The Court disagrees.  Pursuant to the Court's

25   order, both parties submitted separate statements of fact in support of their summary judgment

26   motions.  The Commissioner did not dispute any of the facts in Baumgartner's statement.  Dkt.

27   No. 33-1 at 1.  However, all of the facts asserted by Baumgartner, and stipulated to by the

28   Commissioner, support a conclusion that the ALJ applied the correct legal standards and based his

findings on substantial evidence.

## V.     CONCLUSION

Based on the foregoing, Baumgartner's motion for summary judgment is denied and the

Commissioner's cross-motion for summary judgment is granted.

**IT IS SO ORDERED.**

Dated: 11/27/2017

HOWARD R. LLOYD
United States Magistrate Judge

United States District Court
Northern District of California